# In the United States Court of Federal Claims

### No. 17-490C
### Filed: June 30, 2017[1]

```
* * * * * * * * * * * * * * *
```

| | |
|---|---|
| **i3 CABLE & HARNESS LLC,** | |
| **Protestor,** | **Post-Award Bid Protest; Judgment on the Administrative Record; Waiver; Price Evaluation; Technical Evaluation; Organizational Conflict of Interest; Bad Faith.** |
| **v.** | |
| **UNITED STATES,** | |
| **Defendant,** | |
| **and** | |
| **ACE ELECTRONICS DEFENSE SYSTEMS, LLC,** | |
| **Defendant-Intervenor.** | |

```
* * * * * * * * * * * * * * *
```

**Cynthia Malyszek**, Malyszek & Malyszek, Westlake Village, California for protestor i3 Cable & Harness LLC.

**Kelly A. Krystyniak**, Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her were **Patricia M. McCarthy**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Vera A. Strebel** and **Laura J. Barke**, Defense Information Systems Agency/Defense Information Technology Contracting Organization, Scott Air Force Base, Illinois.

**Jonathan D. Shaffer**, Smith Pachter McWhorter PLC, Tysons Corner, Virginia for Defendant-Intervenor Ace Electronic Defense Systems, LLC. Of counsel were **Mary Pat Buckenmeyer** and **Todd M. Garland**, Smith Pachter McWhorter PLC, Tysons Corner, Virginia.

---

[1] This opinion was issued under seal on June 16, 2017. The court afforded the parties an opportunity to propose redactions in the published opinion and the parties did not seek any redactions. The opinion is issued in full below.

**O P I N I O N**

**HORN, J.**

**FINDINGS OF FACT**

This is a post-award bid protest brought by protester i3 Cable & Harness LLC (i3) against defendant United States, acting through the Defense Information Systems Agency/Defense Information Technology Contracting Organization (DISA/DITCO or the Agency). Participating as a defendant-intervenor is Ace Electronics Defense Systems, LLC (Ace), the awardee of the contract at issue. Motions for judgment on the administrative record filed by each of the parties are presently before the court.

On May 27, 2016, the Agency issued a request for proposals (RFP), HC1028-16-R-0010 (the Solicitation), for the contract currently under consideration. The Solicitation solicited Installation Kits (IKs) for the Project Manager Mission Command (PM MC), Product Manager (PdM) Joint Battle Command - Platform (JBC-P) program. The JBC-P is a networked battle command information system that enables military units to share nearly real-time friendly and enemy-situational awareness information, operational maps and graphics, and command and control messages. The program is managed by United States Army, Program Executive Office Command Control Communications-Tactical (PEO C3T). The Solicitation required awardees to design, develop, produce, modify, and deliver IK, cables, and brackets to support the installation of the PM MC managed systems and related subsystems of PEO C3T, as well as supply engineering services to support the creation of new IKs and for the modification of existing IKs. IKs are an integral part of the JBC-P systems that provide the electrical and mechanical interfaces to the vehicle platform. Individual cables and hardware, such as mounting brackets, are critical to the support and maintenance of the vehicles equipped with JBC-P systems. Engineering services for development of new kits and modification of existing kits are essential in keeping up with JBC-P fielding and capability requirements.

The Solicitation stated that the intended award would be a firm-fixed priced (FFP), Indefinite Delivery/Indefinite Quantity (IDIQ) contract for a base period of three years with seven one-year options and one six month extension. The "estimated overall value" of the contract was $99.4 million with a "minimum guarantee" of $1 million. The Solicitation stated that the award would be made to the offeror whose proposal was technically acceptable and offered the lowest price to the government using the Lowest Price Technically Acceptable (LPTA) valuation process.

The Solicitation contained two evaluation factors: (1) Technical/Management Factor; and (2) Cost/Price Factor. The Technical/Management Factor had four subfactors and was to be evaluated on an Acceptable or Unacceptable basis. The portion of the Solicitation setting forth the requirements for the Technical/Management factor stated, in full:

**2. Technical/Management Factor**

Failure to be found technically acceptable will result in the Offeror being ineligible for award. In order to be found technically acceptable under Factor 1, the Offeror must be found acceptable under each of the below subfactors:

a. The Offeror must submit proof with its proposal of the following:

(1) at a minimum, dual sources of supply for **all types** of materials/components outlined in the Installation Kit Level II Drawing Package, Suppliers must all be valid companies with current cage codes;

(2) copies of valid ISO 9001 or AS9100 Quality Management Certifications for all Suppliers, Subcontractor, and Prime; and

(3) A Quality and Supply Chain Management Plan which provides procedures to assess Supplier quality and performance.

b. The Offeror must submit proof of manufacturing kitting processes to include: sub-kitting; rack flow; staging; work-line instructions; visual guides; quality checks; and specialized package techniques.

c. The Offeror must submit proof of available facilities, equipment, and human resources to support a kitting production line that will provide Installation Kits at a steady state rate of 1,000 Installation Kits per month, with a surge rate up to 4,000 Installation Kits per month within five (5) months of order receipt. Surge rate must sustained throughout the entire period of performance if required by the Government.

d. The Offeror must submit proof of Installation Kit engineering design steps and processes from kit design through installation and integration into a Department of Defense vehicular platform and ability to execute rapid and simultaneous design efforts.

**The technical evaluation will be given one of the following ratings:**

| Table 1. Technical/Management Ratings | |
|---|---|
| **Rating** | **Description** |
| Acceptable | Proposal/quotation clearly meets the minimum requirements of the solicitation. |
| Unacceptable | Proposal/quotation does not clearly meets the minimum requirements of the solicitation. |

(emphasis in original).

The portion of the Solicitation setting forth the requirements for the Cost/Price factor stated, in full:

### 3. Cost/Price Factor

The Offeror's price proposal will be evaluated for award purposes based on proposed total evaluated price. The total evaluated price will be calculated as the sum total of evaluated pricing for Installation Kits, Spares [spare parts], T&M [time and materials] labor and the cost reimbursable-only (i.e. no fixed fee) travel estimate provided by the Government computed as follows:

*Installation Kits and Spares (Firm Fixed Price)*

The Offeror's quoted unit prices for the provided quantity ranges (proposed in the Attachment J-3- IK Pricing Model) will be multiplied by the Government-possessed quantity for each CLIN/item identified in Section B. The sum of all resultant CLIN pricing will equate to evaluated price for the ordering period.

*Time and Materials (T&M) Labor Rates*

The Offeror's quoted hours will be multiplied by the proposed T&M labor rates in the provided Attachment J-3 – IK Pricing Model. The resultant product of the computation will constitute the T&M evaluated price for the ordering period.

*Total Evaluated Price*

The total evaluated price will consist of the offeror's evaluated price for IK Installation, Spares, and T&M labor and the Government-provided cost reimbursable travel estimate for the base period, all option periods, and the option pricing for the additional six-month period IAW [in accordance with] FAR 52.217-8. FAR 52.217-8 authorizes the Government to require continued performance of any services within the limits and at the rates specified in the contract. The pricing proposal should include a separate line item for the additional six-month period IAW FAR 52.217-8. These prices shall be identical to the proposed pricing in the six months prior to expiration of the base period, or the final option period, if option periods are present. Evaluation of options shall not obligate the Government to exercise such options.

The offeror's price proposal will be evaluated to determine if it is reasonable and complete. Normally, price reasonableness is established utilizing one or more of the price analysis techniques defined in FAR 15.404-1. The Government will determine completeness of the offeror's proposal by

> verifying that all solicitation requirements have been priced, figures are correctly calculated, and costs are presented within the mandatory pricing template provided in Attachment J3 – IK Price Template to the Request for Proposal.
>
> Award will be made to the technically acceptable offeror that represents the lowest evaluated price, as this is a LPTA requirement.

(emphasis in original).

The Attachment J-3 Price Template mentioned above in the requirements of the Cost/Price Factor, was a template in the format of a Microsoft Excel spreadsheet that was included with the Solicitation. The Attachment J-3 template allowed offerors to input their pricing for IKs, spare parts (Spares), and time and material (T&M) labor categories for the three base years, seven options years, and a six month extension. For the IKs and Spares portion of the Attachment J-3 template, offerors were required to input different prices for orders of 1-19, 20-49, 50-149, 150-999, and 1000-4999 units for each year.

Additionally, a portion of the Solicitation titled "**General Instructions**," stated, in part:

> The offeror's proposal must include all data and information requested by the Request for Proposal (RFP) and must be submitted in accordance with these instructions. The offeror shall be compliant with the requirements as stated in the IK Level II Drawing Package, Statement of Work (SOW), and Contract Data Requirements List (CDRL). **Non-conformance with the instructions provided in this Information to Offerors *may* result in removal of the proposal from further evaluation.**

(emphasis in original).

The Statement of Work (SOW) attached to the Solicitation contained the following provisions relevant to the present protest:

> 5. <u>Scope</u>. This Statement of Work (SOW) sets forth the tasks and efforts the Contractor shall perform during this contract. . . .
>
> * * *
>
> 8. <u>Place of Performance</u>. Contractor shall perform all activities at the Contractor's facilities with the exception of when travel is required to support the requirements of the SOW. Travel will be required as directed by the COR [Contracting Officer Representative]. Contractor personnel will travel to various (CONUS [Continental United States] only) locations in support of IK development and production efforts.

(emphasis in original).

Final proposals under the Solicitation and its amendments were due on November 28, 2016. Before the deadline for the submission of proposals, the Government received responses from five offerors, including three relevant to the present protest: i3, Ace, and Tabet Manufacturing Co. (Tabet).

Ace's proposal, in its executive summary, contained the following language relevant to the present protest:

### 1 INTRODUCTION

Ace Electronics Defense Systems, LLC (ACE) is a privately held, Service-Disabled, Veteran-Owned Small Business (SDVOSB) and is International Organization for Standardization (ISO) 9001:2008 certified. The company specializes in electronics manufacturing services to include electronics and mechanical design, manufacturing of cabling assemblies, diagnostic repair and integration services including higher-level electro-mechanical assemblies. With our 22,000 sq. ft. manufacturing facility in Troy, MI and resources to another 18,000 sq. ft. in Metuchen, NJ, we support rapid prototyping and full scale production runs and is [sic] equipped with the latest manufacturing and test equipment, as well as injection molding machines. Our 80,000 sq. ft. facility in Lexington, KY supports all aspects of the kitting requirement, including receiving, kitting, marking, packaging, and shipping.

Our commitment to providing the most cost effective quality products and services on a timely basis has given us the advantage to excel in the wire, cable, and electronic field. We have thoroughly reviewed the Production of the U.S. Army, Project Manager Mission Command (PM MC) Installation Kits (IKs) Solicitation Package and fully understand all requirements.

\* \* \*

### 4.1.1 SUBCONTRACTORS

ACE intends to subcontract a portion of the cable assemblies to our primary cable partner, Federal Prison Industries (Unicor). ACE and Unicor will be responsible for 100% of the cable assemblies in order to meet the FAT [First Article Testing] and production requirements. Once testing has been completed and production facilities approved, a work-share providing best value to the government will be established.

All of the metal components required for this solicitation will be subcontracted. ACE has qualified multiple companies that are capable of producing all of the components. . . .

(capitalization and emphasis in original).

According to the initial Price Evaluation Report, prepared by the Source Selection Evaluation Board (SSEB) and issued November 30, 2016, the evaluated prices for IKs and Spares for each of the five offerors were determined by multiplying the prices provided in the offerors' Attachment J-3 templates by government-estimated quantities of 150 units for each of the three base years and seven option years and by 75 units for the six month extension. The initial Price Evaluation Report makes no mention of how these government-estimated quantities were determined. After reviewing each of the five proposals, the SSEB determined that ACE had the lowest Total Evaluated Price (TEP) with $484,913,135.56, Tabet had the second lowest with $492,476,512.38, and i3 had the fourth lowest with $612,179,182.05. The "independent government cost estimate" (IGCE) determined in the initial Price Evaluation Report was $487,062,977.44. Because the SSEB also found that Ace's proposal met the requirements of the Solicitation's Technical/Management Factor, the SSEB recommended that the award under the Solicitation be made to Ace. On December 15, 2016, a contracting officer called Ace to advise it of the government's decision to make an award to Ace and followed up with an email stating that Ace was the apparent awardee of contract number HC1028-17-D-0002.

On December 27, 2016, after receiving notice from the Agency that it was an unsuccessful offeror, i3 filed a protest with the Government Accountability Office (GAO), challenging the government's decision to award the contract to Ace. In its protest before the GAO, i3 alleged that: (1) the government's evaluation of i3's and Ace's pricing proposals was flawed because i3's and Ace's TEPs exceeded the maximum contract value identified in the Solicitation; (2) the government's evaluation of Ace's technical proposals was flawed because Ace allegedly did not have direct management oversight for one of its subcontractors; and (3) the government treated offerors unequally through the release of certain amendments to the Solicitation. On January 10, 2017, the government informed the GAO that it intended to take corrective action and requested that the GAO dismiss the protest. In particular, the government's notice to the GAO stated that the government would "Re-evaluate the quantities used in the calculation of the Total Evaluated Price" and, "[i]n accordance with the RFP, . . .  identify the lowest priced proposal and conduct an evaluation of the proposal." On January 26, 2017, the GAO dismissed i3's protest as academic.

On February 15, 2017, the Agency notified all five offerors via email that "[a]s a result of the protest received . . . , the Government has taken corrective action and is re-evaluating proposals with regard to the Total Evaluated Price." The email requested that offerors confirm the "validity" of their most recent proposals by February 21, 2017. In a memorandum for record (MFR) dated February 15, 2017, the Agency explained, how it had determined the re-evaluated quantities to be used in the calculation of the TEP as part of the corrective action. Based on historical practices, projected needs, and the price savings available at the 150-999 range, the Agency determined that, as it had done during the initial price evaluation, it would use an estimated quantity of 150 units for each individual purchase. Rather than simply apply the 150 unit quantity for each of the three base years and seven option years (and 75 units for the six month extension), as it did during the initial price evaluation, however, the Agency organized all types of IKs and Spares into three groups that would be purchased at different frequencies over the course of the contract: 1) Items Purchased Often; 2) Items Purchased Moderately; and 3) Items

Purchased Rarely. Items Purchased Often were assumed to be purchased three to four times over the course of the contract. Items Purchased Moderately were assumed to be purchased two to three times over the course of the contract. Items Purchased Rarely were assumed to be purchased once over the course of the contract. According to the MFR, the identification of each of the three groups was based upon "the historical frequency of procurements of IKs and Spares under the Previous IK Contract" and "current/future fielding and sustainment requirements." The MFR summarized the overall process it used in coming to the re-evaluated quantities as follows:

> [T]he Government: (1) carefully analyzed its current stock levels of IKs and Spares; (2) evaluated its anticipated needs of IKs and Spares in the future; (3) reviewed its historic purchasing patterns under the Previous IK Contract; and (4) ensured that the IGCE did not exceed the set value of the future IK contract. As a result, the estimated quantities and the projected procurements of IKs and Spares are a reasonably accurate representation of the Government's anticipated needs.

Based on the re-evaluated government-estimated quantities, the SSEB determined that the pricing proposal submitted by Tabet represented the lowest priced solution, with a TEP of $106,245,279.33. Ace was determined to have the second lowest price, with a TEP of $119,821,714.72, while i3 was determined to have the fourth lowest price, with a TEP of $142,610,654.61. The ICGE was determined to be $107,980,857.62. The SSEB also determined, however, that the technical portion Tabet's proposal was not acceptable because it did not meet all of the requirements of the Technical/Management Factor stated in the Solicitation. In accordance with the terms of the Solicitation, the SSEB evaluated the technical proposal of the next lowest priced offeror, Ace, and determined that it did meet all of the requirements of the Technical/Management Factor. Based on these results, the SSEB recommended that the award of the contract be made to Ace. On March 27, 2017, the contracting officer lifted the stop work order and Ace was allowed to proceed with the contract. On the same day, the Agency issued post-award and debriefing letters to all parties that had submitted a response to the Solicitation.

Protestor filed a bid protest complaint in this court on April 7, 2017. In its complaint, protestor alleges that the award of the contract at issue to Ace was improper and requests that the court so declare and that the contract should properly have been awarded to i3. Protestor did not request an injunction. A motion to intervene was filed by Ace on the same day and granted by the court on April 10, 2017. Protestor filed a motion for judgment on the administrative record on May 4, 2017, and defendant and defendant-intervenor each filed cross-motions for judgment on the administrative record and responses to protestor's motion on May 17, 2017. Protestor filed its response to defendant and intervenor's cross-motion on May 23, 2017, and defendant and defendant-intervenor filed replies to protestor's response on May 30, 2017.

## DISCUSSION

Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC) (2016) governs motions for judgment on the administrative record. The court's inquiry is

directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005))); see also Strategic Bus. Sols., Inc. v. United States, 129 Fed. Cl. 621, 627 (2016); Rotech Healthcare Inc. v. United States, 118 Fed. Cl. 408, 413 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010). Pursuant to RCFC 52.1, in a bid protest, the court reviews the agency's procurement decision to determine whether it is supported by the administrative record. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013).

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)–(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001); see also Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380 (Fed. Cir. 2012) (explaining that the Tucker Act expressly waives sovereign immunity for claims against the United States in bid protests). The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision. See, e.g., Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) ("Protests of agency procurement decisions are reviewed under the standards set forth in the Administrative Procedure Act ('APA'), see 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706), 'by which an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]'"); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir. 2010) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir. 2004) (citing Scanwell Labs., Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

When discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit addressed subsections (2)(A) and

(2)(D) of 5 U.S.C. § 706, see Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332 n.5, but focused its attention primarily on subsection (2)(A). See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013) ("'[T]he proper standard to be applied [to the merits of] bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Banknote Corp. of Am. v. United States, 365 F.3d at 1350–51 (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057–58 (Fed. Cir.), reh'g denied (Fed. Cir. 2000)), aff'd, 365 F.3d 1345 (Fed. Cir. 2004)))), reh'g and reh'g en banc denied (Fed. Cir. 2013) (alterations in original). The statute says that agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D) (2012);[2] see also Tinton Falls Lodging Realty, LLC v.

---

[2] The language of 5 U.S.C. § 706 provides in full:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1347 (Fed. Cir. 2013); COMINT Sys. Corp. v. United States, 700 F.3d 1377, 1381 (Fed. Cir. 2012) ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); Bannum, Inc. v. United States, 404 F.3d at 1351)); Savantage Fin. Servs. Inc., v. United States, 595 F.3d 1282, 1285–86 (Fed. Cir. 2010); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1358 (Fed. Cir. 2009); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332); Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007) ("'[T]he inquiry is whether the [government]'s procurement decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."'" (quoting Bannum, Inc. v. United States, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000))); NVT Techs., Inc. v. United States, 370 F.3d at 1159 ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (internal citations omitted); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000)."); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. 334, 340 (2012). "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting PAI Corp. v. United States, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), reh'g and reh'g en banc denied (Fed. Cir. 2011); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358 ("In applying this [arbitrary and capricious] standard to bid protests, our task is to determine whether the procurement official's decision lacked a rational basis or the procurement procedure involved a violation of a regulation or procedure.") (citing Savantage Fin. Servs., Inc. v. United States, 595 F.3d at 1285–86); Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2013); McVey Co., Inc. v. United States, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); PlanetSpace, Inc. v. United States, 92 Fed. Cl. 520, 531–32 (2010) ("Stated another way, a plaintiff must show

---

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706.

that the agency's decision either lacked a rational basis or was contrary to law." (citing Weeks Marine, Inc. v. United States, 575 F.3d at 1358)).

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

> [W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1358; F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285–86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007). The United States Supreme Court also has cautioned, however, that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA." Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it is legally permissible, reasonable, and supported by the facts. See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1383; R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing Ray v. Lehman, 55 F.3d 606, 608 (Fed. Cir.), cert. denied, 516 U.S. 916 (1995)). """If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.""" Weeks Marine, Inc. v. United States, 575 F.3d at 1371 (quoting Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); Jordan Pond Co., LLC v. United States, 115 Fed. Cl. 623, 631 (2014); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Norsat Int'l [America], Inc. v. United States, 111 Fed. Cl. 483, 493 (2013); HP Enter. Servs., LLC v. United States, 104 Fed. Cl. 230, 238 (2012); Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 780 (2011).

Stated otherwise by the United States Supreme Court:

Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977) (internal citations omitted); see also U.S. Postal Serv. v. Gregory, 534 U.S. 1, 6–7 (2001); Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974), reh'g denied, 420 U.S. 956 (1975); Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); In re Sang Su Lee, 277 F.3d at 1342; Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. at 285)); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 959 (Fed. Cir. 1993); BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir. 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990). Accordingly, agencies "are entrusted with a good deal of discretion in determining which bid is the most advantageous to the

Government." Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69.

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958–59; see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995 (Fed. Cir. 1996); Geo-Med, LLC v. United States, 126 Fed. Cl. 440, 449 (2016); Cybertech Grp., Inc. v. United States, 48 Fed. Cl. 638, 646 (2001) ("The court recognizes that the agency possesses wide discretion in the application of procurement regulations."); Furthermore, according to the Federal Circuit:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368–69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))).

On a motion for judgment on the administrative record, a disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence. See Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d at 1364; see also Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995–96; Davis Boat Works, Inc. v. United States, 111 Fed. Cl. at 349; Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340. The Federal Circuit has indicated that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough." PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

> A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C.

§ 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; FirstLine Transp. Sec., Inc. v. United States, 119 Fed. Cl. 116, 126 (2014); Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013). To prevail in a bid protest case, the protestor not only must show that the government's actions were arbitrary, capricious, or otherwise not in accordance with the law, but the protestor also must show that it was prejudiced by the government's actions. See 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 907 ("In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial.") ; Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694-96 (2010). In describing the prejudice requirement, the Federal Circuit also has held that:

> To prevail in a bid protest, a protester must show a significant, prejudicial error in the procurement process. See Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996); Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). "To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract." Data General, 78 F.3d at 1562 (citation omitted). Rather, the protester must show "that there was a substantial chance it would have received the contract award but for that error." Statistica, 102 F.3d at 1582; see CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (to establish competitive prejudice, protester must demonstrate that but for the alleged error, "'there was a substantial chance that [it] would receive an award--that it was within the zone of active consideration.'") (citation omitted).

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir.), reh'g denied (Fed. Cir. 1999); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1326 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2011); Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332-33; OMV Med., Inc. v. United States, 219 F.3d 1337, 1342 (Fed. Cir. 2000); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057; Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1380 (Fed. Cir. 2000).

In Data General Corp. v. Johnson, the United States Court of Appeals for the Federal Circuit wrote:

> We think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract . . . . The standard reflects a reasonable balance between the importance of (1) averting unwarranted

interruptions of and interferences with the procurement process and (2) ensuring that protesters who have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances.  This is a refinement and clarification of the "substantial chance" language of CACI, Inc.-Fed. [v. United States], 719 F.2d at 1574.

Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir.), reh'g denied, en banc suggestion declined (Fed. Cir. 1996); see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d at 912; Bannum, Inc. v. United States, 404 F.3d at 1353, 1358 ("The trial court was required to determine whether these errors in the procurement process significantly prejudiced Bannum . . . .  To establish 'significant prejudice' Bannum must show that there was a 'substantial chance' it would have received the contract award but for the [government's] errors" in the bid process. (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d at 1319; Alfa Laval Separation, Inc. v. United States, 175 F.3d at 1367; Statistica, Inc. v. Christopher, 102 F.3d at 1581; Data Gen. Corp. v. Johnson, 78 F.3d at 1562); see also Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011); Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1057 (using a "reasonable likelihood" rule); Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1380 (using a "substantial chance" test); Archura LLC v. United States, 112 Fed. Cl. at 496 (using a "substantial chance" test); Info. Scis. Corp. v. United States, 73 Fed. Cl. 70, 96 (2006) (using a "substantial chance" test), recons. in part, 75 Fed. Cl. 406 (2007).

Initially, the court notes that the arguments made by protestor in its briefs in support of its motion for judgment on the administrative record are conclusory, repetitive, poorly structured, and offered with little or no citations to the record. Protestor also fails to cite to few, if any, applicable statutes, regulations, or case law for support. That being said, as best as the court can tell, protestor appears to argue that the Agency erred in awarding the contract at issue to Ace on four grounds. First, protestor appears to allege that the price evaluations made by defendant as part of the corrective action, and the estimated quantities upon which they were based, are arbitrary, capricious, and an abuse of discretion. Second, protestor appears to allege that defendant violated the evaluation criteria in the Solicitation by awarding the contract to Ace because Ace was not "technically capable" of performing the contract. Third, protestor appears to allege that Ace had an impermissible Organizational Conflict of Interest (OCI) through its subcontractor Unicor. Fourth, in an argument raised for the first time in its reply brief, protestor argues that the award to Ace constituted an impermissible "directed award" by defendant.

Defendant and defendant-intervenor argue that protestor's first argument was waived because it concerns a term of the Solicitation that was not challenged prior to the close of bidding, and, in the alternative, that protestor's argument fails on the merits.  With regard to protestor's second argument, defendant and defendant-intervenor argue that the Agency's determination that Ace's proposal was technically acceptable was reasonable. With regard to protestor's third and fourth arguments, defendant and defendant-intervenor assert that protestor has failed to offer sufficient evidence to meet

its burden of demonstrating that Ace or Unicor had an OCI or that there was a "directed award."

I.      Price Evaluations and the Corrective Action

In its motion for judgment on the administrative record, protestor identifies what it alleges are three separate sources of error related to the price evaluations made as part of the corrective action evaluation: "The Agency's corrective action evaluations were arbitrary and capricious, and an abuse of discretion"; "[t]he Agency failed to make a proper price evaluation"; and "[t]he Agency's corrective action reassessment of its estimated quantities and updated Independent Government Contract Estimate (IGCE) upon which it based the price evaluation of offerors and award was not reasonable and was arbitrary and capricious." (emphasis omitted). Although stylized as three separate sources of error, each of the three are based on the same substantive allegations: that the price evaluations made after the corrective action, and the estimated quantities upon which they were based, were arbitrary and capricious. Indeed, in its reply brief, protestor dispenses with the three separate allegations and simply summarizes its argument as: "the corrective action price evaluation was based on different criteria [from those contained in the Solicitation] and resulted in different price rankings of the offerors." (internal citations omitted).

Although protestor's arguments are highly repetitive and often difficult to follow, it appears to argue that the price evaluations were arbitrary and capricious on two grounds. First, protester appears to challenge the Agency's use of undisclosed estimated quantities to evaluate the TEP of offerors' proposals, stating: "It is unreasonable to have offerors price a proposal based on two different unknown and undisclosed quantities," the government estimated quantities used during the initial price evaluation and the re-evaluated estimated quantities used in the price evaluations performed during the time when the Agency took corrective action. According to protestor, it is "unfair to offerors and voids competition if offerors must bid on such large unknown variance of estimated quantities stated by the Agency" because "[i]t is a given that proposing pricing for larger quantities versus smaller quantities affects all offerors [sic] proposal pricing." According to protestor, "[i]t is apparent that the pricing would have been different for the offerors if they were aware of the difference in the estimated quantities and the IGCE between the first and corrective action evaluations by the Agency." Protestor also asserts that the amounts of the estimated quantities used by the Agency to evaluate price during the corrective action were unreasonable, stating: "there is no assurance in the second corrective action that the estimated quantities are a fair and reasonable estimate of the needs under this contract."

In the first place, defendant and defendant-intervenor both argue that protestor's objections regarding the estimated quantities used are waived because they amount to untimely challenges to the terms of the Solicitation. Both argue that, under the terms of the solicitation, the Agency was not required to disclose the estimated quantities to offerors. According to the defendant and defendant-intervenor, under Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, protests regarding the terms of a solicitation must be filed prior to the close of the bidding process. Defendant and defendant-intervenor

argue that, because protestor failed to object to the use of undisclosed estimated quantities prior to the close of bidding on the contract at issue, the objection was waived. In addition, both defendant and defendant intervenor argue that, to the extent protestor's arguments are properly before the court, they fail on the merits because the price evaluations performed by the Agency as part of the corrective action were "reasonably based on historical ordering patterns and anticipated needs" and were "conducted in accordance with the terms of the solicitation."

In Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, the United States Court of Appeals for the Federal Circuit addressed whether, if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. In Blue & Gold Fleet, L.P. v. United States, the protestor challenged the National Park Service's award of a contract to Hornblower Yachts, Inc. (Hornblower) for ferry services to Alcatraz Island. See Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1310-11. The protestor argued that Hornblower's proposal did not include employee wage and benefits information required by the Service Contract Act, thus, making the Park Service's evaluation of the cost of Hornblower's proposal flawed. See id. at 1312. The Federal Circuit acknowledged that "[b]y statute, the Park Service must 'evaluate . . . proposals and make an award based solely on the factors specified in the solicitation.'" Id. at 1313 (quoting 10 U.S.C. § 2305(b)(1)). Moreover, in Blue & Gold, the Federal Circuit acknowledged that "[i]n this case, it is true that the decision not to apply the Service Contract Act to the contract may have influenced the evaluation of the proposals; however, the Park Service made this decision during the solicitation, not evaluation, phase of the bidding process." Id. The Federal Circuit noted that the solicitation "did not include any requirement that the bidders consider the Service Contract Act," id., and that the protestor had not raised any objection to the exclusion of Service Contract Act requirements prior to the submission of proposals. Therefore, the Federal Circuit found that the protestor was challenging the terms of the solicitation, not the agency's evaluation of Hornblower's proposal. See id.

The Federal Circuit also noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the Park Service had selected Hornblower for contract award. See id. at 1311. In considering whether the protestor had waited too long to challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Draken Int'l, Inc. v. United States, 120 Fed. Cl. 383, 393 (2015).

In Blue & Gold, the Federal Circuit held:

[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of

the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Per Aarsleff A/S v. United States, 829 F.3d at 1312; Sys. Dynamics Int'l, Inc. v. United States, 130 Fed. Cl. 499, 517 (2017); Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); Universal Marine Co., K.S.C. v. United States, 120 Fed. Cl. 240, 248–49 (2015); Northeast Constr., Inc. v. United States, 119 Fed. Cl. 596, 609 (2015); Innovative Mgmt. Concepts, Inc. v. United States, 119 Fed. Cl. 240, 245 (2014); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in Blue and Gold Fleet thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original).

The Federal Circuit also explained in Blue & Gold:

"It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005); see also Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014).

To the extent protestor argues that the Agency's price evaluation was arbitrary and capricious because it was based on "two different unknown and undisclosed quantities," protestor challenges the terms of the Solicitation. The Cost/Price Factor portion of the Solicitation explicitly stated that the IKs and Spares portions of offerors proposals would be determined, in part, by multiplying the proposed price for each IK and Spare provided in the offerors' Attachments J-3 templates by a "Government-possessed quantity" and then summing the results. The Solicitation makes no mention as to the amounts of the "Government-possessed quantit[ies]" the Agency would use in evaluating prices, and the fact that the quantities were "Government-possessed" implies that they would not be disclosed to offerors. Indeed, protestor somewhat surprisingly admits in its motion for judgment on the administrative record that "the Agency was not required under the

solicitation to provide estimated quantities to offerors" and that "the solicitation advised offerors that the quantities used in the Total Evaluated Price would not be disclosed." That the Agency ultimately re-evaluated the estimated quantities it would use during the corrective action did not alter the government's responsibilities under the Solicitation. The re-evaluated estimated quantities the Agency used during the post-corrective action, price evaluations were still "Government-possessed quantit[ies]" and the Agency was not required to disclose them to offerors under the terms of the Solicitation, which was not altered by the corrective action. It is undisputed that protestor did not challenge the terms of the Cost/Price Factor portion of the Solicitation, or any other aspect of the Solicitation, prior to the close of bidding, when offerors reconfirmed their bids, or at any time during the corrective action period when the agency was re-evaluating the proposals it had received prior to the award. Therefore, protestor's argument that the Agency's use of "unknown and undisclosed quantities" to evaluate price was improper has been waived.

To the extent, however, protestor alleges that the price evaluation the Agency undertook as part of the corrective action, and the re-evaluated estimated quantities that the Agency used during that price evaluation, were unreasonable because they were based on improper criteria, protestor's allegations go beyond challenging the terms of the Solicitation. Here, the Agency initially evaluated offerors' prices by multiplying the proposed price for each IK and Spare in the Attachment J-3 templates by 150. After the initial price evaluation was included as one of the challenges before the GAO, the Agency took corrective action to "[r]e-evaluate the quantities used in the calculation of the Total Evaluated Price" and re-evaluate proposals based on the re-evaluated quantities. Ultimately, the Agency decided to separate the different types of IKs and Spares into three categories—1) Items Purchased Often; 2) Items Purchased Moderately; and 3) Items Purchased Rarely—and assign a different estimated quantity to each category. In the contemporaneous MFR, dated February 15, 2017, the Agency described in some detail the process of how it determined into which category to place each IK and Spare. The MFR summarized this process as follows:

> [T]he Government: (1) carefully analyzed its current stock levels of IKs and Spares; (2) evaluated its anticipated needs of IKs and Spares in the future; (3) reviewed its historic purchasing patterns under the Previous IK Contract; and (4) ensured that the IGCE did not exceed the set value of the future IK contract. As a result, the estimated quantities and the projected procurements of IKs and Spares are a reasonably accurate representation of the Government's anticipated needs.

Protestor does not allege that the Agency did not follow the process outlined in the February 15, 2017 MFR. Instead, to the extent that any specific argument can be discerned from protestor's briefs, protestor appears to argue that the fact that the different estimated quantities between the initial and corrective action evaluations resulted in different TEPs for the offeror's proposals shows that both were unreasonable, stating: "The corrective action price evaluation was based on improper criteria as well as the initial evaluation because they were both in opposition and conflict of the other, and as such both are invalid to determine a proper pricing basis for award." Simply because the re-evaluated estimated quantities, and the resulting TEPs, arrived at by the Agency during

the corrective action were "in opposition and conflict," i.e., different, from those the Agency arrived at during the initial price evaluation, however, does not imply that the re-evaluated numbers were "invalid," or otherwise improper. Indeed, such a rule could render all corrective action which produced a different result from an agency's initial evaluation "invalid." Protester, thus, has failed to meet its burden of demonstrating that the Agency's price evaluations during the corrective action were arbitrary and capricious. Further, the contemporaneous February 15, 2017 MFR demonstrates that the government's decisions regarding the re-evaluated quantities to be used in the price evaluation were based on a reasoned analysis of its historical practices and future needs, and, thus, was well within the Agency's discretion. Judgment on the administrative record in favor of defendant and defendant-intervenor on the issues related to price evaluation and the corrective action is, therefore, warranted.

II.   Technical Evaluation of Ace

Protester next alleges that the award to Ace was improper because Ace's proposal did not meet three requirements contained in the Technical/Management Factor of the Solicitation. First, protestor asserts that, although "[t]he awardee proposal states that Ace and Unicor will be 100% responsible for the cable assemblies," "[t]his cannot be performed in the same Ace facilities." (citation omitted). According to protestor this violates paragraph 8 of the SOW, which states: "8. Place of Performance. Contractor shall perform all activities at the Contractor's facilities . . . ." (emphasis in original). Second, protestor asserts that "[t]he award to Ace violates the Management Requirement because Unicor does not allow direct program oversight as is required by the contract." Although protestor cites to the SOW for this assertion, it does not identify a specific provision that it believes Ace's proposal violated. Third, protester asserts, for the first time in its reply brief, that

> [T]he awardee cannot perform to the terms of the contract. It cannot keep the schedules, or perform the task. The incumbent, DSR,[3] rejected ACE as a subcontractor because they could not do the work, and based on their qualifications they did not have the ability to perform.

Protestor provides no citation to the record or evidence to support any of these serious, bald allegations against Ace.

With regard to protestor's claim that Ace could not be "100% responsible" for cable assemblies, defendant interprets protestor as alleging that Ace's proposal was not technically acceptable because it proposed to have subcontractors perform some manufacturing activities. Defendant notes the use of subcontractors is consistent with several provisions of the Solicitation, and that, to the extent SOW paragraph 8 conflicts with these provisions, there is a patent ambiguity in the Solicitation that protestor failed to protest in a timely manner. Defendant also argues that, in any case, protestor cannot

---

[3] The contract presently at issue is a follow-on contract to a contract for the acquisition of IKs and engineering services that was held by DRS Tactical Systems, Inc. (DRS). Thus, protestor appears to be referring to DRS when it mistakenly refers to "DSR" in its briefs.

establish prejudice for any alleged violation of SOW paragraph 8 because i3 also proposed to manufacture some items under contract at subcontractor locations. Defendant-intervenor adds that the citations to Ace's proposal that protestor cites do not support its claims as they have "nothing to do with the facilities where the work will take place." With regard to protestor's claim that Ace violated the "Management Requirement," defendant-intervenor notes that protestor provides no citations to the record to indicate the basis for this protest ground and also states that, "Ace proposed to have full management responsibility for this contract and will not relinquish control to any of its subcontractors." With regard to protestor's assertion that Ace "cannot perform to the terms of the contract" based on its alleged past experience with the incumbent, defendant and defendant-intervenor both note that protestor fails to cite any evidence in support of its assertion and, thus, fails to meet its burden of proof. Defendant-intervenor also requests that protestor's allegations in its reply brief regarding Ace's ability to perform the contract be "stricken as impertinent and scandalous" under RCFC 5.4(a)(1) (2016).

Regarding protestor's allegation that Ace's proposal violates paragraph 8 of the SOW, paragraph 8 requires that the "Contractor shall perform all activities at the Contractor's facilities with the exception of when travel is required to support the requirements of the SOW." Although it is less than clear what language in Ace's proposal protestor believes violates this provision, it may be the portion of the Ace's executive summary that states: "ACE intends to subcontract a portion of the cable assemblies to our primary cable partner, Federal Prison Industries (Unicor). ACE and Unicor will be responsible for 100% of the cable assemblies in order to meet the FAT [First Article Testing] and production requirements." Although the court doubts that it was the intent of the SOW to prohibit all subcontracting of production work, which would be a drastic step, a strict reading of paragraph 8, which covers "all activities" performed at the contractor's facilities, could be read as imposing such a prohibition. As defendant points out, however, the language in the Technical/Management Factor of the Solicitation requiring offerors to submit proof of "<u>at a minimum</u>, <u>dual sources of supply</u> for all types of materials/components outlined in the Installation Kit Level II Drawing Package," as well as "copies of valid ISO 9001 or AS9100 Quality Management Certifications for all Suppliers, <u>Subcontractor</u>, and Prime" would be in direct contradiction to such a reading. (emphasis added; original emphasis omitted). Thus, at a minimum, there was, again, a patent ambiguity between the language of SOW paragraph 8 and the Technical/Management Factor of the Solicitation. Because protestor failed to object to any such patent ambiguity in the Solicitation prior to the close of the bidding process, it has waived its ability to do so now. <u>See</u> <u>Blue & Gold Fleet, L.P. v. United States</u>, 492 F.3d at 1313 ("We also hold that a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.").

The court turns next to protestor's allegation that "[t]he award to Ace violates the Management Requirement because Unicor does not allow direct program oversight as is required by the contract." Review of both the Solicitation and the SOW reveals nothing labeled as a "Management Requirement" or requiring "direct program oversight." Additionally, although both defendant and defendant-intervenor identified this problem in

their respective cross-motions for judgment on the administrative record, protestor failed to clarify or even mention this issue in its reply brief. Further, even if "direct program oversight" was a requirement of the Solicitation, protestor fails to provide or note in the record any evidence that Unicor "does not allow" such oversight. Protestor's bare assertion, therefore, does not even come close to meeting its burden of demonstrating that the Agency's actions were arbitrary and capricious in this regard.

Finally, the court turns to protestor's assertion that the alleged incumbent "rejected ACE as a subcontractor because they could not do the work." Again, protestor offers nothing more than a bald assertion. Despite making this claim twice in its reply brief, protestor offers no citation for its claim, nor is there any evidence in the record that the incumbent or anyone else has ever "rejected" Ace for any reason. Absent such evidence, there is nothing in the record that supports protestor's assertion that Ace "cannot keep the schedules, or perform the task." Indeed, this language is utterly lacking in support and irresponsible towards Ace. Counsel for the protestor should refrain from making unsupported allegations which serve no purpose and waste everyone's time. Needless to say, protestor has failed to carry its burden with respect to this allegation.

### III.   Organizational Conflict of Interest

The court turns next to protester's argument that the contracting officer failed to properly identify an OCI held by Ace's subcontractor Unicor. "Under FAR § 9.504(a), a CO [Contracting Officer] must '[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible' and '[a]void, neutralize, or mitigate *significant potential conflicts* before contract award." Turner Constr. Co. v. United States, 645 F.3d at 1386 (quoting 48 C.F.R. § 9.504(a)) (emphasis and alterations in original). "'A significant potential conflict of interest is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.'" Id. (quoting PAI Corp. v. United States, 614 F.3d 1347, 1352 (Fed. Cir. 2010)). "However, the FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381–82 (citing 48 C.F.R. § 9.505). Therefore, "[t]he CO has considerable discretion in determining whether a conflict is significant." Turner Constr. Co. v. United States, 645 F.3d at 1386 (quoting PAI Corp. v. United States, 614 F.3d at 1352). Further, the identification of an OCI "must be based on 'hard facts; a mere inference or suspicion of an actual or apparent conflict is not enough.'" Id. at 1387 (quoting PAI Corp. v. United States, 614 F.3d at 1352).

Protestor's counsel asserts, once again without elaboration, that an OCI existed in the present case because "[a]s a federal government entity, UNICOR[4] could have

---

[4] According to defendant, Unicor is a component of the Federal Bureau of Prisons, a division of the United States Department of Justice, that operates manufacturing activities in federal prisons. See generally Unicor, About Unicor, https://www.unicor.gov/about.aspx; Unicor, Direction & Management of FPI FAQs https://www.unicor.gov/FAQ_Direction.aspx.

potentially have had access to or been privy or inadvertently had information concerning the solicitation that other offerors did not have." (capitalization in original). "Unequal access OCIs can occur when a company has access to nonpublic information in performing a government contract that may give it a competitive advantage in a later competition for a government contract." <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1382. Protestor, however, fails to specify why Unicor would have had access to nonpublic information that would have given it a competitive advantage, other than to assert, without citation to the record or offering evidence, that Unicor is "a federal government entity."[5] Moreover, by asserting only that Unicor "could have <u>potentially</u> have had access to or been privy or inadvertently had information concerning the solicitation," protestor fails to even allege an actual OCI, and instead suggests only the possibility of one. (emphasis added). Absent the presence of facts to support its allegations, the court cannot find that the contracting officer failed to fulfil her duties to identify and avoid potential conflicts under FAR § 9.504(a). <u>See</u> <u>Turner Constr. Co. v. United States</u>, 645 F.3d at 1387 (affirming United States Court of Federal Claims decision finding the GAO erred in finding an unequal access OCI where "[t]he GAO cited to no facts supporting its conclusion" that an offeror's subcontractor "had access to any information of competitive worth").

In its reply brief, protestor raises, for the first time, an additional argument in support of its assertion that Ace's relationship with Unicor raises an improper OCI. According to protestor, Ace's use of Unicor "led to unfair competitive advantage" because

It takes the opportunity out of a small business set aside for a small business. It takes away the opportunity for a small business to give jobs to many employees and from the community. Ace is relying on Unicor extensively for a high volume of each order and this takes away growing a small business and creating jobs.

Again, the court notes that protestor's counsel has characteristically failed to provide any citations to the record, statutes, regulations, or case law to support protestor's assertions. Regardless, it is obvious that the alleged effects of the award of the contract at issue on small businesses and job creation are irrelevant to the issue of whether Ace or Unicor had a competitive advantage over other offerors because of access to nonpublic information. Protestor's assertions in its reply brief, thus, do not come close to meeting the level of evidence required to support the seriousness of an OCI allegation. Judgment on the administrative record in favor of the defendant and defendant-intervenor on the issue of an improper OCI, therefore, is granted.

IV.   <u>Directed Award</u>

Protestor also argues, for the first time in its reply brief, that "[i]t appears from the initial evaluation and subsequent corrective action evaluations that this was a directed

---

[5] Protestor does not offer any explanation as to why a component of the Federal Bureau of Prisons would have had access to nonpublic information during the Solicitation process, which was managed by DISA/DITCO, a component of the United States Department of Defense.

award to Ace." Protestor's allegation that the government "directed" award of the contract to Ace suggests an allegation that the government was biased towards Ace, or that the government acted in bad faith. See Labat-Anderson, Inc. v. United States, 42 Fed. Cl. 806, 833 (1999) (referring to allegations involving the "premature determination of the awardee" as "the epitome of bad faith agency conduct"). In order to prove that a government official's actions were biased, a protestor must overcome the well-established presumption that government officials act in good faith. See Croman Corp. v. United States, 724 F.3d 1357, 1364 (Fed. Cir. 2013) ("The presumption that government officials act in good faith is enshrined in our jurisprudence."); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1337. A protestor must offer "clear and convincing evidence" that the government did not act in good faith in order to prevail. See Croman Corp. v. United States, 724 F.3d at 1364; see also Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002). The United States Court of Appeals for the Federal Circuit has addressed the standard for overcoming the presumption of good faith as follows:

> Government officials are presumed to "act 'conscientiously in the discharge of their duties.'" Kalvar Corp., Inc. v. United States, 543 F.2d 1298, 1301 (Ct. Cl. 1976) (quoting Librach v. United States, 147 Ct. Cl. 605, 612 (1959)). Courts have always been "loath to find to the contrary," and to induce a court to abandon the presumption of good faith dealing, "requires 'well-nigh irrefragable proof.'" Id. at 1301-02 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954)). Thus, [a protestor] must offer clear and convincing evidence that [the government] did not act in good faith in order to prevail on this issue. Am-Pro Protective Agency, 281 F.3d at 1239-40.

Croman Corp. v. United States, 724 F.3d at 1364; see also Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1288 (Fed. Cir. 2010); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1239 ("The presumption that government officials act in good faith is nothing new to our jurisprudence. See, e.g., Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630 (1954) (stating 'we start out with the presumption that the official acted in good faith')."); Square One Armoring Serv., Inc., v. United States, 123 Fed. Cl. 309, 329 (2015) (holding that a plaintiff alleging that the government has acted in bad faith must offer well-nigh irrefragable proof in support of its claim); Austin v. United States, 118 Fed. Cl. 776, 790 (2014) ("To overcome this presumption, the plaintiffs must produce 'well-nigh irrefragable proof' of bad faith on the part of the government."); Kogan v. United States, 112 Fed. Cl. 253, 266 (2013) ("The presumption of good faith 'is valid and binding unless well-nigh irrefragable proof is offered to rebut or overcome it.' McEachern v. Office of Pers. Mgmt., 776 F.2d 1539, 1545 (Fed. Cir. 1985).").

The presumption that government officials act in good faith, however, is rebuttable and not automatically accepted by the court. The Federal Circuit in Am-Pro Protective Agency defined the "clear and convincing" standard of proof a protestor must meet to prevail as:

A requirement of proof by clear and convincing evidence imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt.  "Clear and convincing" evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is *highly probable*."

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240 (quoting Price v. Symsek, 988 F.2d 1187, 1191 (Fed. Cir. 1993)) (internal citations omitted in original and emphasis in original).

Moreover, the Federal Circuit described the type of proof necessary to establish that a government official acted in bad faith by "clear and convincing" evidence, as

equated with evidence of some specific intent to injure the plaintiff.  Thus, in Gadsden v. United States, [111 Ct. Cl. 487, 489-90 (1948),] the court compared bad faith to actions which are "motivated alone by malice."  In Knotts, the court found bad faith in a civilian pay suit only in view of a proven "conspiracy . . . to get rid of plaintiff."  Similarly, the court in Struck Constr. Co. v. United States, [96 Ct. Cl. 186, 222 (1942),] found bad faith when confronted with a course of Governmental conduct which was "designedly oppressive."  But in Librach, [v. United States, 147 Ct. Cl. 605 (1959),] the court found no bad faith because the officials involved were not "actuated by animus toward the plaintiff."

* * *

Nothing in Brown's affidavit [whereby Am-Pro attempted to show bad faith], moreover, suggests that the government "had a specific intent to injure" Am-Pro.  Caldwell [& Santmyer, Inc. v. Glickman,] 55 F.3d [1578,] 1581 [(Fed. Cir. 1995)].  And Am-Pro has not alleged that these threats were "motivated alone by malice," Gadsden v. United States, 111 Ct. Cl. 487, 489, 78 F. Supp. 126 (1948); as part of a proven "conspiracy . . . to get rid of [Am-Pro]," Knotts, 128 Ct. Cl. at 500, 121 F. Supp. 630; as part of a course of governmental conduct which was "designedly oppressive," Struck, 96 Ct. Cl. at 222; or as "actuated by animus toward" Am-Pro, Librach, 147 Ct. Cl. at 614.

Am-Pro Protective Agency, Inc. v. United States, 281 F.3d at 1240, 1241 (quoting in part Kalvar Corp. v. United States, 211 Ct. Cl. 192, 543 F.2d 1298, 1302 (1976), cert. denied, 434 U.S. 830 (1977)) (citations omitted in original); see also Galen Med. Assocs., Inc. v. United States, 369 F.3d at 1330 ("'[A]llegations of bad faith . . . ha[ve] been equated with evidence of some specific intent to injure the plaintiff.'" (quoting Torncello v. United States, 231 Ct. Cl. 20, 45, 681 F.2d 756, 770 (1982))); Dekatron Corp. v. United States, 128 Fed. Cl. 115, 118 (2016) ("Bad faith has been found when a contracting officer representative acts with specific intent to injure or the contracting officer fails to exercise independent

judgment or remedy the contracting officer representative's animus. . . ."); Madison Servs. Inc. v. United States, 94 Fed. Cl. 501, 507 (2010) ("Because plaintiff submits as evidence unsubstantiated innuendo and uncorroborated inferences, evidence that categorically cannot meet a 'clear and convincing' standard, the court must deny plaintiff's requests for relief.") (citations omitted); id. at 511 & 511 n.8 (adding unreliable hearsay and attorney arguments to the list of what will not meet the standard for demonstrating bad faith); L-3 Commc'ns Integrated Sys., L.P. v. United States, 91 Fed. Cl. 347, 354 (2010) (innuendo or suspicion is not enough to demonstrate bad faith); N. Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 187-88 ("Courts have found bad faith when confronted by a course of government conduct that was 'designedly oppressive,' Struck Constr. Co. v. United States, 96 Ct. Cl. 186, 222, 1942 WL 4411 (1942), or that 'initiated a conspiracy' to 'get rid' of a contractor, Knotts v. United States, 128 Ct. Cl. 489, 121 F. Supp. 630, 636 (1954)."), appeal dismissed, 226 F. App'x 1004 (Fed. Cir. 2007).

In support of its allegation that the Agency engaged in a "directed award," protestor asserts that "[t]he Agency's pricing evaluations contrasted with each other. And, the technical evaluations overlooked the technical ability factors and the ability to perform in their quest for a directed award." In support of its assertion that the government "overlooked" Ace's "ability to perform," protestor asserts that "neither Ace or their subcontractors, including Unicor, would be able to produce" "Stryker Cables" because "[t]he Stryker Cables requires [sic] unique processes of chemical cure that doesn't exist within Ace or its subcontractors." Protestor provides no citations to anything in the record and offers no evidence that explains what "unique process" is needed to produce a "Stryker cable," or that demonstrates that Ace or Unicor lack the capabilities to produce them. Moreover, protestor's reply brief is protestor's first mention of "Stryker cables" and the quote is the only description of "Stryker cables" in its filings. Protestor's bald allegations regarding "Stryker cables" do not amount to cognizable evidence because they are unsupported by anything in the administrative record. See CWT/Alexander Travel Ltd. v. United States, 78 Fed. Cl. 486, 495 n.9 (2007) ("[T]he plaintiffs provide no evidentiary support for these assertions, and assertions alone do not constitute evidence.").

Moreover, protestor offers no evidence that the Agency acted in bad faith. That the initial price evaluation and the corrective action price evaluation "contrasted with each other" is unsurprising given that the Agency's stated purpose in undertaking the corrective action was to re-evaluate the estimated quantities it would use in order to re-evaluate the TEPs of the offerors. Further, the ultimate awardee, Ace, actually was hurt by the corrective action, going from having the lowest TEP to the second lowest TEP. Additionally, the evidence does not demonstrate that the government "overlooked the technical ability factors" of the offerees. Instead, the record establishes that, after undertaking corrective action, the SSEB performed an evaluation as to whether the lowest priced offeror, Tabet, met the requirements for the Solicitations Technical/Management Factor, and, then, after determining that Tabet's proposal did not, performed a similar analysis on Ace's proposal. Thus, the government evaluated the proposals according to the Lowest Price Technically Acceptable evaluation process called for by the Solicitation. Protestor fails to identify any reasons why the corrective action technical evaluations performed by the SSEB were flawed, let alone the sort of clear and convincing evidence

necessary to demonstrate bad faith, and none is apparent to the court upon review of the record. Protestor's bald allegation that the Agency engaged in a "directed award" is totally unsupported by evidence, and is insufficient to overcome the presumption that the Agency acted in good faith in awarding the contract to Ace. See Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1323 n.2 (Fed. Cir.) ("ITAC [Information Technology & Applications Corp.] has pointed to no record evidence of bias.  Instead it has merely reiterated its contentions that the Air Force erred in evaluating the proposals. This is not evidence of bias, and it is insufficient to overcome the presumption that the contracting officer acted in good faith." (citing Spezzaferro v. Fed. Aviation Admin., 807 F.2d 169, 173 (Fed. Cir. 1986))), reh'g and reh'g en banc denied (Fed. Cir. 2003).

## CONCLUSION

For the reasons described above, protestor's motion for judgment on the administrative record is **DENIED**, defendant's motion for judgment on the administrative record is **GRANTED**, and defendant-intervenor's motion for judgment on the administrative record is **GRANTED**. Protestor's complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**